1-6-3-4-7-4. Sean Carter versus Bobby Bogan. Arguments not to exceed 30 minutes per side. Chief Troutman for appellant. Chief Judge Cole and may it please the Court, my name is Rachel Troutman and I'd like to reserve seven minutes for rebuttal, please. That's fine and you may proceed. Thank you, Your Honor. Sean Carter's competency has been at the forefront of this case from the very beginning. The last time we were before this Court was after the District Court found Mr. Carter to be incompetent. Mr. Carter was incompetent at the time of his trial and the Ohio Supreme Court made an unreasonable determination of the facts in light of the evidence in the state court record when it found otherwise. One important factor to remember here is that competency is fluid. So Mr. Carter had two competency hearings initially. As the Supreme Court stated in drope, however, even when a defendant is competent at the commencement of trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial. That's what happened here. Mr. Carter deteriorated over time and you can see his deterioration from the record, it's clear. But the record also reveals a failure of the state courts to give the proper weight to the information that was before it, the information that suggested incompetence. In terms of his conduct, behavior at trial, was it, you obviously believe it was, deteriorated a great deal from the time of the second competency hearing, which was only, what, a couple weeks before trial, right? Yes, Your Honor. I guess one argument is that his conduct was still pretty clearly problematic as of that second competency hearing. Absolutely. And a lot of the behaviors that you recite in terms of the trial existed at the time of that hearing. So what would have made the trial court see that there had been this great shift or decline or spiraling down in his behavior? Because so much of this existed two weeks before, I think. Well, that's kind of the issue, Your Honor, is that initially in those first two competency hearings, he was incompetent. The trial judge, was it, did we meet this standard at that point, probably? The standard that's so high under the AEDPA that he should have been found incompetent? Perhaps not. But beyond that, when you look at the evidence that happened after that second hearing, first let's, you know, take into consideration the information from before that hearing. As Mr. Carter was suicidal, that he was so suicidal that the prosecution refused to unshackle him, either by his hands or his feet, because he had attempted suicide in so many different times. He, after that second- Does being suicidal mean you're incompetent? No, Your Honor, but it is under the U.S. Supreme Court case law an indicator of competence, and that is not the only thing that Mr. Carter had that indicated- The experts knew at least somewhat about the suicidal. Yes, Your Honor. I mean, ideation is a little, you know, we can talk about ideation, but they knew of that, right? Yes. At that point when the experts evaluated him, they knew whether they were aware, it does not seem from the record that they were aware of how extreme his suicidal ideation and his attempts were. And the record evidence demonstrating that even the prosecutor, this isn't just the defense counsel bringing it to the attention, to the court, it's the deputy and the prosecution that refused to unshackle him because of the danger to both Mr. Carter and to his counsel. So that's partly homicidal as opposed to suicidal. Yes, Your Honor, that is another indicator- But my question there is when I read the record, as outrageous as that was, it seemed to be quite purposive. That is, if you read it, the judge says, I want you to sit down and be quiet and you don't have to do anything, and he says to the judge effectively, so if I act out, then I don't have to go back in the courtroom. And the judge says yes, and so he acts up, which seems, you know, it's not nice, it's not pleasant, but it seems quite purposive in a way that suggests competency, right? He tells him, if you do X, you'll get Y. He says, I want Y, and so he does. Whether that suggests competency, I- Or at least doesn't suggest incompetency or irrationality, right? We might not want to do it. It might seem to be a bad practice, but it is not hallucinatory, it is not bizarre in that sense, is it? Well, remember, the standard, Your Honor, is that he had to have the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. So it is not just whether he seemed like he had a mental disorder, but when you look at the record, especially during that proceeding, you'll see that the judge is repeatedly instructing him, like, we will look into your desire to not be present in the courtroom. Just sit here for this few minutes of testimony for the state witnesses. And he said, I don't want to. And they go back and forth, and it's like a child. I don't want to. I don't want to. And his attorney is instructing him, just stay here, and we will get you where you need to be. They ask him repeatedly if he understands, yes, and then he goes back to, I don't want to. But am I right that he says, like, if I act up in there or something, like get restrained, then they won't take me over there? Yes, Your Honor, you are absolutely right. But that alone, that's an irrational action. It is irrational for a defendant who is standing in front of the judge who is going to decide whether he lives or dies to attack him. That is an irrational behavior. And that is not the only thing. His desire to be absent from trial is an irrational behavior that the U.S. Supreme Court has recognized as an irrational behavior indicative of incompetence. But in addition to that, after that we saw that he had the inability to control his behavior in order to come back into the courtroom. On March 18th, the court started the session with defense counsel telling the court that Mr. Carter didn't want to return. And this is a quote from trial counsel. After talking to some of the deputies, he's having a hard time controlling himself in the jury room, and it would be best for him to remain there. Mr. Carter was alone in the jury room, and he couldn't control his own behavior enough to be brought back into the courtroom. On March 19th, Attorney Consolidain had to bring Sean a candy bar in order to get him to even agree to sit with him, and he still couldn't promise that he would be able to control himself to come back into the courtroom. On March 20th, the court started with defense counsel telling the court that Sean wants to come in for the last day, that he wants to be unshackled. But even the deputies recognized that he could not control his own behavior, suicidal or homicidal, and they would not unshackle him even by his feet. They asked defense counsel to waive the right to be protected from their own client, and defense counsel wouldn't do it. Despite knowing that it would be better for their client to be seated in the courtroom when the jury was going to decide whether he lives or dies, they didn't trust their own client enough that he wouldn't attack them in the middle of the court proceedings. The prosecutor told the court, quote, his behavior has been very impulsive and he has acted up. We've heard him. People have complained that he's hollered in the back. And this is in Volume 9 of the appendix, page 3156. And again, this is when he is alone back in the jury room with just the deputies guarding him. He can't even control his own behavior to the point that the people in the courthouse are hearing him. He wanted to kill his own attorneys so bad they couldn't risk unshackling him. Did he do things in the jury room? Did he do things in the jury room, Your Honor? Is that what you said? That he couldn't control himself even in the jury room. What we know is just what the record reveals, which is what trial counsel was telling the court, was simply that he couldn't. Did he do things in the jury room? The yelling and the screaming is the only thing that we can tell from the record is what he did. His behavior before the second competency hearing also supports a finding, especially when the court had his behavior from before the second competency hearing, adding to it the deterioration afterwards. It's unreasonable that anybody could not have found that he would have required at least a third competency hearing. Again, the court denied, even though his counsel asked for it, the prosecution, the deputy, and the court denied Mr. Carter the ability to be unshackled because of the attempts he'd gone to kill himself. And then in the suppression hearing, again, the defense counsel asked for Mr. Carter to be uncuffed and the deputy wouldn't even allow him to, he couldn't even reach the table to be able to- The suppression hearing was when? It was on January 23, 1998. That's well before trial. Yes. This is another indicator in his decline to incompetence. The court, they wouldn't allow his cuffs to be loosened in order for him to be able to reach the table. Mr. Carter had a family history of schizophrenia, and though I recognize the court can't consider it, that is his diagnosis today, and the court and the experts knew that Mr. Carter was hallucinating and had heard voices even as a juvenile. He'd reported things such as the fact that he was seeing flies and mosquitoes in his cell, that a cat was running across the floor, that he saw snow falling and rain falling in his cell, and he reported hearing the devil's voice. This was reported to the experts? Yes, Your Honor. And then, again, back to evidence beyond that second competency hearing. Once the court started, once voir dire started, in the middle of voir dire, Mr. Carter interrupts proceedings in the middle of his own defense attorney's question to yell out, I'm missing my lunch. That is a bizarre behavior. That's irrational behavior. Then he couldn't even make it through opening statements, and he again interrupts his own defense counsel in front of the jury to say, excuse me, would I have to go through this trial? Can I just plead guilty to it? And I think one thing that's important is that we should look at the fact that the trial court never accepted his guilty plea. And if Mr. Carter was competent enough to withstand these competency hearings, to stand trial, then why wasn't he competent enough to plead guilty? When you say he never accepted his guilty plea, I mean, did he do anything other than what you just indicated? Did they file a motion? Mr. Carter did not file any motions on his own. He repeated multiple times to the court, I want to plead guilty, I want to plead guilty, I want to plead guilty. And he had indicated to the experts that he wanted to plead guilty because he wanted to die. That, his desire to die, again, is an indicator of irrational behavior. Are there cases that hold that? That is obviously from the point of view of a defense attorney and the point of view of the court and most people, you know, wanting to plead guilty in a death case, wanting to get the death penalty would seem irrational. But are there cases that hold that, that that is a, I mean, obviously, you know, through history, we can probably find great people in trials who said, you know, I'm ready to take my punishment. Absolutely. And that would be, if that were all that. Do you have a good case from the Supreme Court or any other case? Yes, Your Honor. Pate v. Robinson, Pate v. Robinson. Your best one? And it's supported, it's one of them. But they do, they cite the fact that his attempts at suicide, where they cite that as an indicator of his incompetence. But importantly, what the court says in Pate v. Robinson is that these cases, they necessitate a detailed discussion of the conduct at trial and the evidence touching upon the question of the competence. So it is an indicator. It's an indicator but not definitive. Right. In that case, we're probably in agreement. In addition to that is Drope v. Missouri. I think we had the same situation in Drope v. Missouri, where the, not only was the petitioner's suicide attempts evidence that the court considered for incompetence, but also the fact that he wanted to be absent from trial. That is irrational behavior for a defendant. Are those cases in which experts said that the person was competent? In one of the two cases, Your Honor, I believe it was. I guess I asked the question because you could say something is an indicator that you need to inquire. It's different from we saw the need to inquire and we inquired and we got experts and they said competent. Yes, Your Honor. Those would be two very different cases, right? Definitely. Again, if it would have stopped there, then our case would not be as strong. However, after that second competency hearing is when all of these irrational behaviors ramped up. Again, you could see the deterioration. So initially you had these suicide attempts, and these are undisputed. This isn't a fact that the warden is disputing, that Mr. Carter had actual suicide attempts and the state brought it out during the trial, that Mr. Carter didn't want to be at his trial. These are indicators that the experts knew, yes. But beyond that, his irrational behavior in the courtroom, lunging at his trial judge, bursting out in the middle of voir dire, bursting out in the middle of closing arguments, the fact that he couldn't control himself back in the room even when he was alone, and trial counsel brought that to the attention of the court. Bursting out in the middle of closing arguments. I'm sorry, opening arguments, Your Honor. My apologies. There's so many facts here. I just want to make sure I didn't miss one. Absolutely. But that's what this court has to do, is look at all of that evidence that is in the record, and it was in the record, in front of the Ohio Supreme Court, and when you look at it together, there is no reasonable argument that the Ohio Supreme Court gave proper weight to that undisputed, and again, it's undisputed evidence that's in the record. Several times now you've said gave proper weight. I mean, is that, you know, a lot of times in different areas of the law, we talk about they gave undue weight or something, but isn't that a good bit short of the AEDPA standard? That is, you know, whenever you have a disagreement about weight, one side thinks you should weigh something more heavily, but isn't the AEDPA standard more stringent than that? Well, yes, the AEDPA standard, obviously this court has to determine whether the Supreme Court unreasonably determined the facts in light of the evidence that was in the state court record. Unreasonable as opposed to gave undue or improper weight, I'm saying aren't those rather different standards? Well, the case law that the Supreme Court was applying, in Pate v. Robinson, that is one of the holdings, is the trial court has to give proper weight. That's one of the cases that the Ohio Supreme Court was supposed to apply in analyzing the evidence that was before it. And when you look at the record evidence, it's clear that the trial court and the Ohio Supreme Court did not give proper weight. They didn't even cite those as factors in their determination, in their analysis of whether he was competent at trial. And the Ohio Supreme Court, in its opinion, they specifically said, quote, the only indications in the record that raised a question of competence to stand trial, one, some evidence indicates he attempted suicide while awaiting trial. Two, he was unwilling to attend court hearings. And three, there were sometimes apparent disagreements with counsel. They didn't cite... Pate is well before AEDPA, right? It's not an AEDPA case. Correct, Your Honor. This was observable behavior by Sean Carter, observable behavior that the trial court saw, and that the Ohio Supreme Court could read in the record. And applying the case law, it should have known that these were indicators of incompetence. But beyond the second competency hearing, once that bizarre behavior started to ramp up, the remedy imposed was not to... it was to go ahead with the trial, but to have Sean Carter put out of the... to remove him from the courtroom. Everything kind of moved smoothly after that. But that is not, obviously, the remedy for a person who is incompetent to stand trial. It wasn't intended as a remedy for that, right? That is the remedy that was imposed. It was not intended as a remedy. It was a remedy for disruption, but you can have disruption and be competent. Absolutely. It's your characterization, though, to say that that was a remedy for incompetence. It was intended, or apparently intended, as a remedy for disruption, right? Yes, Your Honor. Mr. Carter was disrupting the proceedings, but the reason he was disrupting the proceedings were because of his incompetence. But there's also two expert witnesses that say not, though. At that point, Your Honor, before this behavior deteriorated, yes, they said that. There were two out of the three witnesses said that he was competent to stand trial. How do we know? I guess this gets to the thrust of it. How do we know it's deterioration rather than continuation? Well, we don't... I'm sure it happened afterwards, but if the state courts reasonably thought that this was a continuation of what had previously been evaluated, that would be reasonable, wouldn't it? It has to be unreasonable for them to think that this is continuation rather than deterioration. They would have to have considered it, Your Honor, in order to come to that conclusion, and if we apply... Well, I mean, you're basically saying that when these things happened, they should have inquired further. What I am saying is that these are indicators of incompetence. Right, but if comparable indicators had not been sufficient to show experts that he was incompetent, then it would be hard to say that the judge was required continually to ask the same question of the experts, right? I mean, so there's a difference between continuation of these red flags and escalation, right? Yes, Your Honor. I can see your argument if it's one. I have trouble seeing your argument if it's the other. Okay. It's hard for me to see how your argument even holds together if it's just the same symptoms or the same red flags or the same indicators, whatever you want to call them. Well... Basically the same indicators, then surely you can't say that the judge has to continually, every time the same indicators come up, have a new evaluation. Well, to that, Your Honor, I would direct you to the trial court's findings and why it determined that Mr. Carter was competent. And the court determined that Mr. Carter was capable of acting in a rational manner and assisting in his own defense if he wishes to. The evidence... The Ohio trial court at what stage? What are you citing from? This is after the second hearing. Yes, after the second hearing. Let me just ask you one thing to be clear. A couple of times you said, they didn't consider this. Is the they there the trial judge at trial? Or at some point you seem to say, well, the Ohio Supreme Court didn't write enough in its opinion. Are you saying that or are you talking about the trial judge? This court's review is of the Ohio Supreme Court's opinion and in the Ohio Supreme Court's opinion. So the they I'm referring to are the justices. Okay, so it's that, their review of that, and of course there's a lot of law that they don't have to cite everything and write everything down if their ultimate result is not unreasonable, correct? That is true, Your Honor. However, in Wilson v. Sellers, the Supreme Court has stated that, you know, you can take what the court says as its reasoning for its opinion and assume those are the reasons for the court's opinion. We don't have to read further and assume that it's addressed all the other issues and determined otherwise. But the trial court's findings at that point, after the second hearing, they determined that Mr. Carter was capable of acting in a rational manner and assisting in his own defense if he wishes to. So the Ohio Supreme Court, in noting that that was the trial court's opinion at that point, after the second hearing, at that point Mr. Carter's behavior indicated that he was not able to act in a rational manner, that he was not able to assist his counsel. So they were required to consider it at that point because the trial court also has a duty to sua sponte, inquire into the defendant's competence. And the Ohio Supreme Court failed to do that. It's as if, if we started after that second competency hearing and we only examined those facts going forward, those indications that Mr. Carter should have, at the least, had a third competency hearing because he was not behaving in a rational manner and in a manner that he was assisting his counsel. Maybe this leads into your second argument, that trial counsel were ineffective in not presenting the issue of competency more forcefully or clearly to the trial court. Yes, Your Honor. The trial attorneys had their own duty to their client to bring to the court's attention these extra factors. We know from the post-conviction record that Anthony Consaldane said that the only way he could get Mr. Carter to basically allow him in the room was to bribe him with a candy bar and that it was his opinion that his client was not working with him, would not assist him, and he was not rationally capable of doing so and that it was a product of mental illness. The attorneys were the ones who were dealing with him up front and they were the ones who could have alerted the trial court further to that deterioration in Mr. Carter's mental state. They were the ones who saw him on a daily basis. Did they do anything at all to alert the trial court to this demonstrably changed conduct? No, Your Honor. What they did was they were alerting the court in order to basically make sure the record was clear that Mr. Carter, his removal from the courthouse, from the courtroom was because of his behavior and not because there was any violation of his constitutional rights. Every day they would check in with him and then on the record they would tell the trial court no, he still doesn't want to be here. And in doing that they would inevitably say he can't control himself still, he can't behave himself in here. So they were making a little bit of a record without meaning to. However, they knew better. They were the ones who had eyes on Mr. Carter. They were the ones who could hear him and see him interact with the others. And they had a duty to their client to bring it forward. Your Honors, at this point I see that my time... Yes. Is there anything in the record which explains or suggests that there's a reason why these experts would have disagreed based on what they did have before them? Like some were less qualified or more qualified or had greater experience or less experience or didn't look at certain... Yes, Your Honor. My read from the expert reports is... There's a couple things. One of them, the state's expert assumed that Mr. Carter's hallucinations and reports of hallucinations were malingering. And so he was operating from the standpoint that Mr. Carter was trying to avoid death by faking crazy. That's something that an expert can conclude. Absolutely. But it would be irrational for a person who wants to be executed as he's trying to die and he's telling everybody else he wants to die to then fake crazy in order to avoid dying. Would an expert take that into account? If they would, this one did not. And similarly, Dr. Palumbo didn't have all of the information. And a lot of that information didn't come to light until afterwards. Mr. Carter was not cooperative. He didn't, even with his own mitigation psychologist, he wasn't participating. So even though he participated... That wouldn't explain the difference between them. Yes, I'm sorry? That wouldn't explain the difference between the experts. That's what I was going at. King didn't have more information than Alcorn, for example. No, Your Honor. They both had access to Palumbo's first hearing. Yes, they all had access to the same information. Am I right that King ends up saying, well, yes, he's incompetent, but it's a very close call? His close call, that language in particular, is with regard to the mental illness, whether he was slipping into an Access One mental disorder, when you look at that testimony. He was unequivocal when he talked about Mr. Carter was unable to rationally assist his counsel. So the close call language is not with regard to whether he could rationally assist his counsel, which is required in order for him to be tried. If this Court has no questions.  Thank you, Your Honor. Chief Judge Cole, may it please the Court. Christopher Ross on behalf of the Warden. In this habeas case, the District Court accurately applied the standards set forth in AEDPA when it determined that the state courts did not unreasonably determine that Carter was competent to stand for trial, or when they applied the standards of Strickland to determine that his counsel had not rendered ineffective assistance. Now, before I turn to the claims that have been certified for this Court's review, I'd like to spend a minute just framing where we are here in the AEDPA framework. And each of the claims has been presented to the state courts for adjudication on the merits. And so this is an issue that was briefly disputed in the party's briefs, but because the state courts has adjudicated each of the three claims, this Court's review for each claim is under the standards of 2254D. And we can see that from the way that the United States Supreme Court discussed the three claims, as well as looking at the Ohio Supreme Court and the Ohio Court of Appeals decisions on each of the three claims. And second, just as a quick corollary to that point, because we're reviewing these claims under 2254D, the Court's review is limited to the record that was before the state court under Penn Holster. And so some of the records that my colleagues cited, at least in the briefs, are not to be considered by this Court. And so turning to each of the claims and recognizing that much of this previous argument was focused on the first issue about whether the trial court reasonably determined that Carter was competent to stand trial, as well as the Ohio Supreme Court's affirming that opinion. It was a reasonable determination to find that he was competent to stand for trial. And the claim that's presented to this Court, I think, is fairly divided into two separate subplots. So first is the question of whether the actual determination following the two competency hearings, whether that was a reasonable determination. And second is the question about whether the trial court should have held a third hearing sua sponte. The latter is what was mainly proposed by your opposing counsel today, is that correct? The latter of the two was the emphasis of your opposing counsel, is that correct? It was. And so I'll begin with that. And I would point the Court, for this entire claim, to the case of Franklin v. Bradshaw, where very similar claims were raised by the petitioner there. And what the Court said on the sua sponte argument is that when the state court is already aware of certain factors, certain evidence, then the duty to sua sponte hold an additional hearing, it doesn't come into play in the same way that it would as if there was additional behavior or additional bizarre behavior that had not occurred in the first place. And so I would just quickly... What she's saying happened here is that there was additional stuff. Your opposing counsel. That is the argument. Why don't you respond to that argument? She mentioned several things that had not occurred before. So I think that if we look at what the experts had in their reports, as well as what was testified to at the two competency hearings, and as well as what the trial court was able to observe, I think that any argument that there was additional bizarre behavior becomes... Regarding his activity, which the trial court characterized as lunging at the court, I think that's probably one of the stronger pieces of evidence that they rely on. But I think when you look at what occurred in the record, and if you turn to that in-chambers colloquy, as the court was sort of referring to earlier, it comes across as if Carter is deliberately choosing not to be there. He says over and over, I don't want to be here, I don't want to be here, I don't want to be here. And then he asks the court, if I act up, do I have to be here? And it's showing a clear thought process and a rational decision-making to remove himself from the courtroom. And that sort of behavior, that he doesn't want to participate in the trial, is also reflected in what the experts had said, that he was a difficult client, that he was an uncooperative client. And as the district court, as well as the state courts recognized, a difficult client is a far cry from a client who is unable to assist in his own defense. Is there anything in the record about why he didn't want to be in the courtroom? There were a couple of theories. I believe it was in Palumbo's report, where when Carter says that he doesn't want to be at the trial, and specifically why he may be seeking the penalty, the death penalty, Palumbo seems to read that as a desire not to face the family due to the heinous actions of the underlying crime. And that's how at least one of the experts characterizes it. And so again, because the experts had that information, and because the experts had that in their reports, as well as in their testimony before the court, this is all information that was before the trial court. One other fact that my colleague brought up is the idea that Attorney Consoldeen had to bribe Carter with candy bars to get him to participate. Well again, the fact that he supposedly would participate after receiving the candy bar shows that he was intentionally choosing not to cooperate, but that under certain circumstances he might be able to. And so it again reflects a rational thought process, not an inability to participate in his defense. And so the final point that I would make related to whether the trial court should have held a third competency hearing is that under the AEDPA standard, the court needs to look at whether it was a reasonable decision not to. I think there would likely be some question as to whether the sua sponte holding a hearing is a D1 or a D2 question. I think here it's probably a D2 question because we're looking at what facts were before the trial court that might have required it to hold an additional hearing. And I would point the court to another case that was cited in the briefs and that's Cowens v. Bagley where the court said, and I quote here, when virtually everything is potentially relevant and nothing is dispositive, reasonable minds occasionally may come to different conclusions about whether to hold a competency hearing. So here when the question is whether the state courts reasonably or unreasonably looked at the facts and decided to hold or not to hold an additional competency hearing, this quotation indicates that, well, there's a lot of factors that may or may not play into a trial court's decision. And here, as I've suggested, where the trial court held two competency hearings, heard from three separate expert witnesses, heard from two of those witnesses that there was no question that Carter was competent to stand trial, and heard from the third witness that any psychosis or any mental issue was so subtle as to be a close call, the trial court was well within its province to determine at both competency hearings that he was competent to stand trial. And when observing Carter's behavior following the second competency hearing up to and including the last day of trial and the mitigation phase, that nothing that Carter did was new behavior or bizarre behavior outside of the determination that the trial court had already made. And so, if the court has any further questions about the competency issue, I would move on to the questions about the ineffective assistance of counsel. And I think on both of these claims, the state courts reasonably determined that his counsel had not rendered ineffective assistance. And again, to set forth where we are in the AEDPA framework, the Strickland analysis is a question under 2254 D1, and in a habeas proceeding such as this, this court's review is doubly deferential, so that the ultimate question is whether the state court's application of the standard was objectively unreasonable. And looking at what counsel did first during the competency phase, they investigated his history, they had a significant number of records that were provided to Dr. King, and they presented an expert. This expert stood up and told the court about Carter's upbringing, about his history. Dr. King referenced Carter's mental issues. And so all of the evidence that the court needed was present in King's report, and of course as well as in the state's experts' reports. Why did they ask for an MRI? The MRI decision was made, from what I can tell on the record, because the attorney didn't think that it would be helpful or necessary during the competency phase, and that's when it came up during the competency hearings. The court had offered funding, and his attorney decided that it wouldn't be helpful at that time. And when we're looking at the counsel's strategic decisions under Strickland... How is that strategic? I can see how it might be reasonable, just not necessary, but what's strategic about it? This is hypothesizing, of course, but perhaps he was concerned that the MRI would reveal something that he didn't want provided to the court. If there was no organic brain damage, perhaps that would undermine... How would no organic brain damage hurt his case? I don't understand that. Perhaps when it came... I found it puzzling. Sure. Well, I think the argument would be that where the MRI does not show organic brain damage... It's a fact of square zero. If there's no indication that there is such damage, then... Isn't it that at least the defense theory would be that it shows that the symptoms and so on are not faking or malingering? You can't fake the MRI. Presumably they want the MRI, or they might want the MRI, to show that, but if it didn't, wouldn't it undermine that? It's neither confirmatory nor fatal, but sometimes you don't want to ask a question when you don't know the answer. I think that's ultimately... If there was a strategic decision behind it, it would be that they didn't want to poke a sleeping bear. Maybe you can help me. I'm not following that exactly. If it's neutral, it's not like there was DNA evidence and it showed it was somebody else, and you're afraid that it'll show that the DNA evidence is actually the criminal one, so therefore you don't ask for the DNA evidence. Here, the negative result doesn't show that the person is guilty. It just shows that we don't have that evidence. I'm not seeing it. I certainly don't think it would be a question of guilt or not. It's the question of... I'm not seeing the strategy. The strategy of avoiding something that might help the other side isn't much of a strategy if the thing that you don't want doesn't help the other side. I think when you look at what they were trying to show in competency as well as what I expect at the time they were trying to show in mitigation was that he did have some mental issues. I think there's no dispute that there was some mental issues in his history and his past. Where the MRI could hurt that is if it definitively showed that there was nothing harmful in his organic... in the MRI, then that could be used by the other side to undermine its competency and mitigation case. So whether it was a good or effective strategy, I'm not opining on, but it was apparently a strategy that his counsel chose because in the record there is a discussion between the court, the expert witness, Dr. King, and the attorney as to whether it would be necessary for the competency and the counsel declined that at the time. And to point out that he is... The concern would be that the other side would suggest somehow to the jury that if there was nothing physical there was nothing mental. Well, I think you would get the MRI to show that any mental issues were likely because of physical issues. And I think the other side, the prosecution, would likely want to suggest that, well, if there's nothing physical, there's certainly nothing mental I think would be the argument. But what I would want to suggest is that counsel had a mitigation strategy developing from the beginning of the trial. It hired a mitigation expert early on in the process. And so it was certainly thinking about mitigation at least early on in the trial. And again, it may not have been an effective strategy, but it was certainly the strategy that the counsel was pursuing. But aside from that, turning back to what counsel did during the competency hearing, he presented his own expert and this expert was able to show his history and his background and his mental issues. And while this expert testified that Carter may have been incompetent, he conceded on cross-examination that it was a close call. And he even wrote in his report that any potential psychosis was very subtle. And so the counsel got that... Is psychosis the same as competency? That is, no psychosis, therefore competent? I don't know if it's... I don't think it's a direct correlation. I think a psychosis can create incompetency, but I don't know if the converse is true. I don't think that a psychosis necessarily... I don't know whether they were relying on a theory. When he said it was a close call, it would be subtle. You could still say, well, is there theory that he's psychotic, therefore he's incompetent, or is that just, again, one of the considerations that we're talking about? That expert was suggesting that the subtle psychosis could be indicative of incompetency and wanted to pursue that further. But ultimately, when the trial court heard from each of the witnesses, it determined that there was no incompetency to begin with. And in addition, at the competency hearing, the trial counsel conducted a very adequate cross-examination of the state's expert witnesses. And in doing so, they brought out Carter's uncooperativeness with his attorneys. And when we're looking at the competency test under Drope, he really hangs his hat on the side that he was unable to cooperate. And so in cross-examining the state's expert witnesses, they did an effective job in demonstrating his lack of cooperation. Now, of course, as the district court and the state courts recognized, the lack of cooperation is not the same thing as the inability to cooperate. But his counsel did what they needed to do and did their duty to present this information to the court. And so there was simply no deficient performance when it comes to the Strickland test. One point I do want to address is that Carter argues several times in his brief, and it came up in my colleague's time up here, that there was what they frame as a dissent or deterioration into a mental psychosis. And they can't point to anything in the record that shows that beyond what they've characterized as bizarre behavior, there was actually any mental issues that were developing during this time. And so without providing any record citation to this point, the court has no basis on which to find out that there was an unreasonable determination of the facts or an unreasonable application of the law by the state courts. And to support that, the counsel, his attorney, reported back to the trial court several times throughout the trial while Carter was in a separate room. And each time he came in, he suggested that there might have been hesitancy to participate, that he wanted to come back in, but he wanted to be unshackled. But he never suggested that there was any significant mental issue that was limiting his ability to cooperate rather than Carter's continuing to not be cooperative as he had been throughout the process. And so for all these reasons, there was no unreasonable determination that his counsel had rendered ineffective assistance during the competency hearing. And next I'll turn to the question of whether they rendered ineffective assistance during the mitigation phase. And just to treat this briefly, the counsel again did their duty and did what they needed to do to show Carter's background in history to the jury. They effectively prepared a mitigation case and they effectively presented that case to the jury. They hired an independent psychologist who had treated him while he was a child, and they hired a mitigation specialist who was able to reflect similar themes to the jury. They presented a substantial amount of evidence and each of those witnesses had significant record material on which to rely. And so unlike many of the cases where defense counsel renders ineffective assistance during a mitigation case by not conducting an investigation, here the counsel did conduct an investigation and did present substantial evidence to the jury. And for this reason, I think it's unfair to characterize it as simply a plea for mercy. And what was presented to the jury was a pretty standard mitigation case and a capital case. And that was that his history and his background had that he had trouble growing up. He came from a difficult home. He had a difficult fostering process, a difficult adoption process. His mother, some extended family certainly had schizophrenia. He had an emotional affect that was flat. He had never, and as the mitigation expert Sandra McPherson said, he had never learned the boundaries of acceptable behavior and he did not have a normal capacity to think or to feel. And while these are unfortunate and sad circumstances, they were the facts that were presented to the jury. And so it was not simply a plea for mercy which, as they correctly say, is not a viable strategy under Ohio law. It was in fact a plea for a defendant's life based on the circumstances in which he found himself. And finally, I think I would say that it's simply incorrect to say that his, and this is from the brief, that it was ineffective assistance to present his antisocial personality to the jury as a mitigation evidence. And I think that would be, under this court's precedent, antisocial personality disorder is not a categorical type of evidence that necessarily hurts or necessarily helps a defendant. And that's because under Ohio law, it's recognized as a permissible other mitigating factor under the statutory mitigating factors. And this court has actually recognized in another case that failure to present it when antisocial personality is on the record can be ineffective assistance. What case is that? That is from a case, this wasn't cited in the briefs, but the case is Esparza v. Sheldon and the citation is 765 F. 3rd. 615. And as for the second factor that I just recited, that failure to present it can be ineffective assistance. Esparza cites another case called William v. Anderson. And that's where that... Also a Sixth Circuit case. That's where that information comes from. And so taking all of this into consideration, the district court was right to hold that there was no ineffective assistance or that the state courts had not unreasonably determined that there was no ineffective assistance. And if there are no further questions, we would ask that the court affirm the district court's order. Thank you, Mr. Ross. As far as whether antisocial personality disorder is per se an effective assistance to counsel, we've cited lots of cases in our brief, but that doesn't even necessarily have to be the issue here. What Dr. McPherson said to the jury was that Mr. Carter was a, quote, psychopathic character who was unable to understand pain and doesn't have the ability to know what other people are thinking, nor does he care. There is no amount of mitigation that can bring somebody back from that. And the idea that getting somebody tested for organic brain damage in order to not rule out a mental disorder is an unreasonable argument because that is not how you test for a mental disorder. He could have shown that he had zero organic brain damage and he could still be schizophrenic as he is now. One thing I'd like to point out to this court with regard to that organic brain damage argument is that, yes, we have raised these issues below. Yes, the state court ruled in favor of organic brain damage, ruled on Carter's claim that the trial counsel were ineffective for failing to get that MRI, but what's important is the trial court, nor the court of appeals, they never granted him the funding to actually get that testing. And they thought they had no ability. They said they didn't have the authority to do so. So that factor puts this case in a Brumfield versus Cain kind of scenario. So are you saying that it's the judge's fault, it's not an ineffective assistance point? It is an ineffective assistance for the trial counsel for failing to get that MRI done. And then in post-conviction, they raised the claim, but they did not have funding for a neuropsych evaluation or the MRI evaluation. The trial court would have given them the funding for it, but the post-conviction court would not? Correct. And then the court of appeals court also didn't. So without ever granting him the funding, they denied the claim on the merits. And that is why this claim in particular puts it in a Brumfield versus Cain kind of scenario where it was an unreasonable determination of the facts because they never gave him the funding in order to actually have that testing conducted. And that's why we've asked this court to remand the case on that claim, the Ineffective Assistance and Mitigation Counsel, remand it back to the district court so that the court will actually consider the MRI and the neuropsych eval that was done that shows that he does in fact have organic brain damage. When was an MRI done? In federal district court, Your Honor. The district court wouldn't consider it because of pinholster. Pinholster came out. How many years after the trial? I believe the testing was done in 2006, Your Honor, which was... Six years. Yes, roughly, six or seven years. But he had no head injuries in between the time of trial and the time of the testing, so we can assume that the brain was the same. So the idea that the MRI wouldn't have been helpful in light of the mitigation strategy that they didn't pursue, it's an unreasonable argument, and this court should remand back down to the district court to consider that evidence of the MRI because he should have been granted the funding for that MRI to begin with. Moving to the... Just to clarify that, so that would not be... If he should have been granted it at the post-conviction, then that's not an ineffective assistance claim. That's an unreasonable determination on state habeas? Is that the way you would couch it? No, Your Honor, it was ineffective assistance of trial counsel for failing to have that MRI done. Then in post-conviction, counsel raised that argument, so the claim is exhausted. They asked for the funding in order to get the testing done to show the prejudice. Is the state's denial of that an independent ground of attack, and if so, how would you characterize it? We have addressed this issue in our brief, Your Honor. Let me just briefly see if... Essentially, the issue comes down to a 2254-D2 question and whether the trial court's denial... I'm sorry, the state court's denial of that claim is an unreasonable denial on the facts that were before it, because essentially they didn't have the... I understand it if you're saying it goes to prejudice, but I'm having trouble seeing how it goes to... whether it was an unreasonable determination. That is what the U.S. Supreme Court said in Brumfield v. Cain, that the issue there was an Adkins claim, and the attorneys were not given the funding in state court in order to hire the Adkins experts, and then the court denied it on the merits. Post-conviction in an Adkins hearing. And so the U.S. Supreme Court in Brumfield said that it was unreasonable for them to deny this Adkins claim on the basis that he couldn't meet his burden when they never gave him the hearing or the funding in order to meet that claim to begin with. My opponent points to some of the evidence in the record to indicate that Mr. Carter was in fact acting rationally at times. The idea that he acted up in court in front of the judge, the person who was going to determine whether he would live or die, and then also that he was able to be bribed with candy bars, those are in fact irrational behaviors. But even if we put them on the side of that is not an irrational behavior, all of the evidence in the record does not have to be that he was incompetent. The evidence in front of this court and in front of the state court could have been that it was mixed, that there was evidence in favor of finding him competent. But there was more evidence in the record demonstrating that Mr. Carter was incompetent that the state courts never even considered. When you say the state courts never even considered, do you mean they didn't put it in their opinion? Yes, Your Honor, they didn't cite it in their opinion, and we can assume under Wilson v. Sellers that what they said were those three factors that they determined competence by, that that's what they meant. But also, as the district court pointed out, the Ohio Supreme Court never really addressed anything beyond the second competency hearing. It never addressed the fact that he lunged at the judge, that he was not able to control his behavior to come back into court, that he had such homicidal ideation that they couldn't unshackle his feet, that he couldn't control his behavior in the jury room. They didn't address all of those things in considering whether Sean Carter was, in fact, incompetent. I want to ask you about Brumfield v. Cain. Am I right, as it's given in your brief, that that was an Atkins claim raised quite recently, not having to do with post-conviction activity? It was your ability to raise an Atkins claim, which once the Supreme Court decided Atkins, everybody had a right to raise an Atkins claim, right? Yes, Your Honor. I'm sorry, Your Honor. I'm finished. I'm still a little puzzled. What is the state post-conviction supposed to do if, assuming, I know you disagree, assuming that it was legitimate for the state to deny an MRI originally, since it wasn't passed before, what was it supposed, on post-conviction, they're supposed to grant an MRI in order to determine whether the trial court improperly denied it? No, Your Honor. I'm a little puzzled. The trial counsel should have, at the time of trial, should have gone forward with that MRI. Let's assume for the moment that you're wrong on that. You may be right, I don't know, but for analysis of the next question, assume that that was all right to do. Did that do away with the rest of the argument or not? No, Your Honor, because the allegation was that it was ineffective assistance for trial counsel to do away with that, to fail to get that MRI testing. And so, in order to meet that claim, post-conviction counsel, for an indigent client, asked the court for funding for that testing, and the court denied funding and then denied the claim. But that wouldn't, if it was not unreasonable to request before the trial court, then the post-conviction failure to get it was also not a violation, is that right? Because if it wasn't, I don't see what the point of it would have been if it was correct in the first place. Correct not to do it, I guess is what I'm saying. Well, I think the question, to determine whether it was correct not to do it, you have to have the evidence in order to make that determination. And they never got the evidence, is my point. The trial court was going to allow them to do that MRI testing. There was no harm for them to do that MRI testing. They're the ones who requested the MRI testing, and the only reason they didn't do it was because it wasn't relevant to competency. But it would have been relevant to mitigation, and there was no reason for them to forego that testing. So the claim was ineffective assistance of trial counsel for failing to take advantage of that MRI testing and determine whether Sean Carter had brain damage. My question is, if you assume that what happened, but contrary to your argument, if you assume that what happened before the trial court was not constitutionally problematical, then the denial of the MRI at the post-conviction would also not be problematical. Is that true? That would be true. I think we're talking in circles. And I think that's my fault. My point is, if the MRI results were to show that Mr. Carter had organic brain damage, that would have been presented in mitigation. And it would have been way more mitigating than calling him a psychopath. So if trial counsel failed to do that when they could have done that, then that was deficient performance on their part. That is the claim that was raised in the post-conviction. Isn't that circular in terms of, you may disagree with this, but assuming that asking for the MRI might have come out good, might have come out bad, and that's why they didn't ask for it. The fact that ultimately it came out good, which they couldn't know, wouldn't affect it. I mean, it wouldn't affect the logic of that. Now, you may say it was so irrational not to ask for it that they lose, period. But I don't see how you can depend on the outcome afterwards. The outcome is merely the prejudice. The deficiency. My apologies for not making that clear. If it's only prejudice, then I think I can understand it. Okay. Thank you, Your Honors. Well, Ms. Troutman, my sheet here indicates that you've taken this case under the Criminal Justice Act. I assume that's the case. If it is, we certainly thank you very much for taking the case on. You've done a tremendous service to Mr. Carter, to our criminal justice system at large, and certainly appreciate your advocacy today. Mr. Ross certainly appreciates your advocacy on behalf of the state. So the case, from my perspective, very well argued today,  With that, can we close?